# In the United States Court of Federal Claims

ELECTRICAL WELFARE TRUST
FUND, *et al.*,

          Plaintiffs,

          v.

THE UNITED STATES,

          Defendant.

No. 19-353 C

Filed: July 30, 2021

*Joseph Howard Meltzer*, Kessler, Topaz, Meltzer & Check, LLP, Radnor, Pennsylvania for Plaintiffs. With him on the briefs are *Melissa L. Troutner*, Kessler, Topaz, Meltzer & Check, LLP, Radnor, Pennsylvania; *William P. Dale* and *Charles F. Fuller*, McChesney & Dale, P.C., Bowie, MD.

*Eric P. Bruskin*, United States Department of Justice, Civil Division, Washington, D.C. for Defendant. With him on the briefs are *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, National Courts Section, Commercial Litigation Branch, Civil Division; and *L. Misha Preheim*, Assistant Director, Commercial Litigation Branch, Civil Division, Washington, D.C.

## MEMORANDUM AND ORDER

This case arises out of the Department of Health and Human Services' (HHS's) implementation of the Patient Protection and Affordable Care Act of 2010 (ACA). Plaintiffs, self-insured group health plans funded through employee contributions to a multiemployer benefit trust,[1] seek to recover amounts paid under HHS regulations implementing the ACA's Transitional Reinsurance Program (TRP). The TRP mandated that all "health insurance issuers, and third party administrators on behalf of group health plans, [were] required to make payments to an applicable

---

[1] Defendant's motion addresses three Plaintiffs: (1) the Electrical Welfare Trust Fund (EWTF); (2) the Operating Engineers Trust Fund of Washington, D.C. (OETF); and (3) the Stone & Marble Masons of Metropolitan Washington, D.C. Health and Welfare Fund (Stone Masons).

reinsurance entity for any plan beginning in the 3-year period beginning January 1, 2014. . . ." 42 U.S.C. § 18061(b)(1)(A).  HHS regulations implementing the TRP defined the group of entities that were required to contribute to the TRP as "contributing entities."  *See* 45 C.F.R. § 153.20(2) (2019) ("[Contributing entity means f]or the 2014 benefit year, a self-insured group health plan . . . whether or not it uses a third party administrator; and for the 2015 and 2016 benefit years, a self-insured group health plan . . . that uses a third party administrator . . . .").  HHS deemed Plaintiffs' self-insured group health plans as "contributing entities" and, consequently, required Plaintiffs to contribute to the TRP.   Complaint (ECF No. 1) (Compl.) ¶¶ 57-58; Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment (ECF No. 7) (Pls.' Resp.) at 9-10.  Plaintiffs allege that these contribution payments constitute an illegal exaction because HHS's definition of "contributing entity" exceeded its statutory authority and was an unreasonable interpretation of 42 U.S.C. § 18061.  Compl. ¶¶ 100-111; Pls.' Resp. at 2-3.  Plaintiffs also allege that, even if HHS's interpretation of 42 U.S.C. § 18061 was permissible, Plaintiffs are still entitled to recover the fees paid pursuant into the TRP as just compensation under the Fifth Amendment's Takings Clause.  Compl. ¶¶ 89-99; *see also* Pls.' Resp. at 12.

Pending before the Court is Defendant's motion to dismiss Plaintiffs' complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC or Rule) or, in the alternative, Defendant's motion for summary judgment.  *See generally* Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Def.'s Mot.) (ECF No. 6); *see also* Defendant's Reply in Support of Its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Def.'s Reply) (ECF No. 8).[2]  In its motion, Defendant argues that

---

[2] Defendant originally moved to dismiss Plaintiffs' illegal exaction claims for lack of jurisdiction but withdrew this part of the motion at oral argument.  Def.'s Reply at 20 n.8; Oral Argument Transcript (ECF No. 21) at 5:13-19.

Plaintiffs' illegal exaction claims must be dismissed because HHS reasonably interpreted section 18061 to require reinsurance contributions from Plaintiffs.  Def.'s Mot. at 2, 34-35.  Defendant also argues that Plaintiffs fail to state a valid Takings claim because ordinary obligations to pay money, such as Plaintiffs' contributions to the TRP, do not constitute a Fifth Amendment Taking under controlling precedent of the United States Court of Appeals for the Federal Circuit (Federal Circuit).  Def.'s Mot. at 2, 11-14.

This Court has considered each of the parties' filings and arguments.  For the reasons explained below, Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**.  With respect to EWTF, this Court holds that HHS's inclusion of self-administered accounts within the definition of "contributing entity" is contrary to section 18061(b)(1)(A)'s plain language; therefore, Defendant's motion is **DENIED** as to EWTF's illegal exaction claim.  With respect to OETF and Stone Masons, which use a third-party administrator, and are therefore covered under section 18061(b)(1)(A)'s plain language, this Court holds that those Plaintiffs' illegal exaction claims are without merit.   Accordingly, Defendant's motion is **GRANTED** with respect to Stone Masons' and OETF's illegal exaction claims.  Finally, as explained below, Defendant's motion is **DENIED** with respect to Stone Masons', OETF's, and EWTF's Takings claims.

BACKGROUND

I. Plaintiffs' Health Plans

Plaintiffs are group health plans[3] created through collective bargaining and regulated by the Labor Management Relations Act of 1947 (Taft-Hartley) and the Employee Retirement Income Security Act of 1974 (ERISA). Compl. ¶ 3. They are not health insurance issuers.[4] Compl. ¶ 30. Plaintiffs' group health plans "are funded through employee contributions to a multiemployer benefit trust, and benefits under the plans are provided to covered workers and their families pursuant to negotiated wages, hours, and terms of employment through a collective bargaining agreement between one or more unions and more than one employer." *Id.* Participation in these plans is limited to employees who share "a common employer (or affiliated employers), coverage under one or more collective bargaining agreements, membership in a labor union, or membership

---

[3] "[G]roup health plan" is defined by statute as,

> an employee welfare benefit plan (as defined in [29 U.S.C. § 1002(1)]) to the extent that the plan provides medical care (as defined in paragraph (2)) . . . to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise. Except for purposes of part C of title XI of the Social Security Act (42 U.S.C. 1320d et seq.), such term shall not include any qualified small employer health reimbursement arrangement (as defined in section 9831(d)(2) of title 26).

42 U.S.C. § 300gg-91(a)(1).

[4] "[H]ealth insurance issuer" is defined by statute as,

> an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1144(b)(2)]). Such term does not include a group health plan.

42 U.S.C. § 300gg-91(b)(2).

in one or more locals of a national or international labor union." Compl. ¶ 28. Pursuant to 29 U.S.C. § 1103, these plans use funds which are held in trust for the exclusive benefit of the plan participant and which cannot be used for any other purpose. Compl. ¶ 29.

Unlike Plaintiffs, commercial insurers write policies for group and individual health plans. Pls.' Resp. at 5. Plaintiffs allege that, unlike commercial insurers, Plaintiffs' health plans are not commercial in nature and are not sold on the individual market. Compl. ¶ 28. Plaintiffs also note that even before enactment of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (the Act or ACA), Plaintiffs' group health plans did not exclude participants on the basis of pre-existing conditions. Compl. ¶¶ 28, 33; Pls.' Resp. at 5. Thus, according to Plaintiffs, their group health plans did not undertake any additional risk when Congress abolished denials for pre-existing conditions—unlike commercial insurers. Compl. ¶¶ 38, 50.

Plaintiffs' group health plans are self-insured. Compl. ¶ 3. Self-insured multiemployer plans may be administered in one of three ways: (1) self-administered, (2) administered by a third-party administrator that is not a health insurance issuer, or (3) administered by a third-party administrator that is a health insurance issuer through an administrative services only (ASO) agreement. Compl. ¶ 32; Pls.' Resp. at 5-6.

EWTF is a self-administered group health plan. Compl. ¶ 3; Pls.' Resp. at 5. As a self-administered plan, EWTF: (1) determines eligibility and controls enrollment for its participants, (2) performs claims processing and adjudication, and (3) directly pays the health care costs incurred by its participants and beneficiaries. Compl. ¶¶ 19-20. OETF[5] and Stone Masons[6] each

---

[5] OETF's third-party administrator is Associated Administrators, LLC. Compl. ¶¶ 21-22.

[6] Stone Masons' third-party administrator is Carday Associates, LLC. Compl. ¶¶ 23-24.

are administered by a third-party administrator that is not a health insurance issuer.   Compl.

¶¶ 21-24.   These third-party administrators: (1) determine eligibility and control enrollment for its

participants, (2) perform claims processing and adjudication, and (3) directly pay the health care

costs incurred by the OETF and Stone Masons participants and beneficiaries.   *Id*.   ¶¶ 22-24.

## II. Transitional Reinsurance Program

In 2010, President Obama signed the ACA into law.   *See* Patient Protection and Affordable

Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by Health Care and Education

Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively the ACA).

Under the ACA, all individuals must maintain "minimum essential" health insurance coverage, 26

U.S.C. § 5000A, and health insurance providers cannot discriminate against individuals with pre-

existing medical conditions by denying them coverage, 42 U.S.C. § 300gg-3.  As a result, Congress

anticipated that the enrollment of a disproportionate number of previously uninsured, high-risk

individuals into the health insurance market could cause premiums to rise for all insured

individuals. *See King v. Burwell*, 576 U.S. 473, 479-81 (2015).  Among other provisions, the ACA

established three programs to attempt to more evenly distribute the financial risk carried by health

insurance issuers that cover higher-risk populations: (1) the Transitional Reinsurance Program

(TRP), (2) the risk corridors program, and (3) the risk adjustment program.   42 U.S.C. §§ 18061

(codifying the transitional reinsurance program), 18062 (codifying the risk corridors program),

18063 (codifying the risk adjustment program).

At issue here is the TRP, a temporary program intended to stabilize premiums for coverage

in the individual health insurance market during the early years of the ACA's implementation—

2014, 2015, and 2016.  *See* 42 U.S.C. § 18061(c)(1)(A).  To fund the program, the ACA required

that "health insurance issuers, and third party administrators on behalf of group health plans" pay into the appropriate reinsurance pool, whether state or federal, for the three-year period. 42 U.S.C. § 18061(b)(1)(A). The funds collected from the entities described in section (a)(1) were used to reimburse "health insurance issuers" for enrolling high-risk individuals in the individual marketplace. 42 U.S.C. § 18061(b)(1)(B).

Congress delegated authority to HHS to implement the TRP, requiring that HHS—in consultation with the National Association of Insurance Commissioners (NAIC)—create federal standards for the program. 42 U.S.C. § 18061(b)(1). Between July 2011 and March 2014, HHS published three sets of proposed and final rules defining the term "contributing entities," found in 42 U.S.C. § 18061(b)(1).

A. Proposed and Final Rules Titled "Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment"

On July 15, 2011, HHS, for the first time, issued a proposed rule interpreting the term "contributing entity" as "any health insurance issuer and, in the case of a self-insured group health plan, the third party administrator of the group health plan." Def.'s Mot. App. 1 (76 Fed. Reg. 41930 (July 15, 2011)) (ECF No. 6-1) at A23[7] (2011 Proposed Rule). HHS accepted public comments on the 2011 Proposed Rule until September 28, 2011. Id. at A2.

On March 23, 2012, HHS published a Final Rule based on its July 2011 proposal. Def.'s Mot. App. 3 (77 Fed. Reg. 17220 (March 23, 2012)) (ECF No. 6-3) (2012 Final Rule). In the 2012 Final Rule, HHS stated that it received several comments requesting clarification of its proposed definition of "contributing entity." See id. at A1964, A1978. In response, HHS explained that the ACA "directs a broad cross-section of issuers and self-insured plans to make reinsurance

---

[7] The nine (9) appendices attached to Defendant's motion are sequentially paginated. See ECF Nos. 6-1 through 6-9. Throughout this Memorandum and Order, the Court uses this sequential numbering in its citations, preceding the page number with "A."

contributions, given the uncertainty of the size and characteristics of the population that will participate in the Exchanges." *Id.* at A1978.  While HHS claimed that the definition of "contributing entities" is broad, it failed to clarify the definition's alleged breadth in the final regulatory text.  Despite the public comments and noted confusion about the term, HHS instead simply mirrored the ACA's text, stating "[c]ontributing entity means a health insurance issuer or a third party administrator on behalf or [sic] a self-insured group plan." *Id.* at A1988.

B. Proposed and Final Rules Titled "Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014"

On December 7, 2012, HHS issued another proposed rule to "provide[] further detail and parameters related to" a host of ACA topics.  Def.'s Mot. App. 4 (77 Fed. Reg. 73118 (December 7, 2012)) (ECF No. 6-4) (2012 Proposed Rule) at A1996.  In discussing the TRP contribution calculation and collection process in the 2012 Proposed Rule, HHS explained:

> The Affordable Care Act directs that a transitional reinsurance program be established in each State to help stabilize premiums for coverage in the individual market from 2014 through 2016.  The reinsurance program is designed to alleviate the need to build into premiums the risk of enrolling individuals with significant unmet medical needs.  By stabilizing premiums in the individual market equitably throughout the United States, the reinsurance program is intended to help millions of Americans purchase affordable health insurance, reduce unreimbursed usage of hospital and other medical facilities by the uninsured, and thereby lower medical expenses and premiums for all people with private health insurance.

*Id.* at A2027.  Purportedly with the goals of the TRP in mind, HHS's stated aim in administering the program was "to provide reinsurance payments in an efficient, fair, and accurate manner, where they are needed most, to effectively stabilize premiums nationally." *Id.*  At the same time, HHS claims that it sought to minimize the administrative burden of collecting contributions and making reinsurance payments.  *See id.*  HHS stated that "[w]ith respect to self-insured group health plans, the plan is liable, although a third-party administrator or administrative-services-only contractor may be utilized to transfer reinsurance contributions on behalf of a self-insured group health plan,

at that plan's discretion." *Id.* at A2030.  HHS added that "[a] self-insured, self-administered group health plan without a third-party administrator or administrative-services-only contractor would make its reinsurance contributions directly." *Id.*  Further, HHS stated that "[u]nder section 1341(b)(3)(B)(i) of the Affordable Care Act, contribution amounts for reinsurance are to reflect, in part, an issuer's fully insured commercial book of business for all major medical products." *Id.* (internal quotations omitted).  Accordingly, HHS interpreted section 1341(b)(3)(B)(i) to mean that "an issuer will not be required to make reinsurance contributions for coverage that is non-commercial." *Id.*  The public comment period on this 2012 Proposed Rule closed December 31, 2013.  *Id.* at A1996.

On March 11, 2013, HHS published a final rule based on its 2012 Proposed Rule.  78 Fed. Reg. 15410 (March 11, 2013).  During the preceding comment period, several commenters had requested that HHS amend the definition of "contributing entity" to clarify the liability of third-party administrators.  Def.'s Mot. App. 6 (78 Fed. Reg. 15410 (March 11, 2013)) (ECF No. 6-6) (2013 Final Rule) at A3564.  In response to the comments received, HHS clarified that "a self-insured group health plan is ultimately responsible for the reinsurance contributions, even though it may elect to use a TPA or ASO contractor to transfer the reinsurance contributions." *Id.*

Several commenters had also requested that group health plans regulated by Taft-Hartley and ERISA be excluded from reinsurance contributions because "many of these plans are self-insured and self-administered, and include multiemployer plans." *Id.* at A3568.  HHS responded that it "d[id] not have authority under the statute to exclude [self-insured and self-administered plans regulated by Taft-Hartley and ERISA] from reinsurance contributions[,]" because these plans' coverage was "employment-based." *Id.* at A3568.  However, the 2013 Final Rule stops short of explicitly stating whether HHS believed self-insured or self-administered group health

plans created through collective bargaining and regulated by Taft-Hartley and ERISA were considered "commercial."

HHS's 2013 Final Rule, thus clarified that all self-insured group health plans (including plans that are self-administered, and those regulated by Taft-Hartley and ERISA) were included within its definition of "contributing entity." *See id.* at A3634.

HHS's 2013 Final Rule defining "contributing entity" reads as follows:

> *Contributing entity* means a health insurance issuer or self-insured group health plan. A self-insured group health plan is responsible for the reinsurance contributions, though it may elect to use a third party administrator or administrative services only contractor for transfer of the reinsurance contributions.

*Id.* at A3634.

Thus, under HHS's amended the definition of the term "contributing entity" in the 2013 Final Rule, all self-insured group health plans—including self-administered plans—were required to make reinsurance contributions. *Id.*

C.  Proposed and Final Rules Titled "Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015"

In December 2013, HHS issued another proposed rule seeking comment on, *inter alia*, the definition of "contributing entity." Def.'s Mot. App. 7 (78 Fed. Reg. 72322 (December 2, 2013)) (ECF No. 6-7) (2013 Proposed Rule). HHS stated in its 2013 Proposed Rule that "continued study of this issue," had led it "to believe that [section 1341] may reasonably be interpreted in one of two ways." *Id.* at A3670. Specifically, HHS explained its belief that the ACA section 1341 (1) "may be interpreted to mean that self-insured, self-administered plans must make reinsurance contributions," or, (2) alternatively, "may be interpreted to mean that such plans are excluded from the obligation to make reinsurance contributions." *Id.* Accordingly, HHS yet again proposed to modify the definition of "contributing entity" for the 2015 and 2016 plan years, this time to exclude

self-insured group health plans that do not use the services of a third-party administrator. *See id.*

Consequently, HHS's 2013 Proposed Rule amended the definition of "contributing entity" to

exclude self-insured group health plans that do not use a third-party administer (TPA) in

connection with claims processing, adjudication, or enrollment. *Id.* at A3670, A3714. However,

HHS's proposed definitional exclusion for self-insured, self-administered plans from the

contributing entity definition did not apply to the 2014 benefit year. *Id.* As to why HHS did not

apply this exclusion to the 2014 benefit year, HHS cited "public policy" explaining:

> While, upon further consideration of the issue, we believe the statutory language can reasonably be read to support the proposition that self-insured group health plans that do not use third party administrators for the functions described above should not be obligated to make reinsurance contributions, we also recognize, as a public policy matter, that it would be disruptive to plans and issuers to modify the definition of "contributing entity" for the 2014 benefit year at this late date. Health insurance issuers have already set premiums and developed operational processes based on the definition of 'contributing entity' for the 2014 benefit year at this late date. Health insurance issuers have already set premiums and developed operational processes based on the definition of 'contributing entity' that was previously finalized in the 2014 Payment Notice. To prevent lower reinsurance payments, the contribution rate would have to be raised for other contributing entities, many of whom have already set their 2014 premiums based on the contribution rate finalized in March 2013. Excluding self-insured, self-administered group health plans from the set of entities that must provide reinsurance contributions for the 2014 benefit year, without raising the rate on other entities, would decrease the funds available for reinsurance payments for that benefit year, and thus upset settled estimates with respect to expected reinsurance payments that were used to establish premiums.
>
> Therefore, we do not propose to change the definition of "contributing entity" for the 2014 benefit year.

*Id.* at A3671.

Additionally, in its 2013 Proposed Rule, HHS stated that self-insured plans administered

by a third-party administrator would still be required to make reinsurance contributions. *Id.* at

A3670. HHS explained that "[a]n insured plan and a self-insured plan administered by a

third-party administrator are similar in that each arrangement involves an employer and an outside

11

commercial entity—an issuer or a third-party administrator (which is often an insurance company or an affiliate)—for the administration of the core health insurance functions of claims processing and plan enrollment." *Id.*  Additionally, HHS noted that,

> under section 1341(b)(3)(B) of the Affordable Care Act and § 153.400(a)(1)(ii), reinsurance contribution amounts are to reflect a "commercial book of business." Our consideration of these comments leads us to believe that a group health plan administered by a third party administrator would normally be viewed as part of the third party administrator's "commercial book of business," but that a self-insured, self-administered plan would not normally be viewed as part of an entity's "commercial book of business."

*Id.*  As a result, HHS proposed that "contributing entity" would mean: "(a) A health insurance issuer; or (b) a self-insured group health plan (including a group health plan that is partially self-insured and partially insured, where the health insurance coverage does not constitute major medical coverage) that uses a third-party administrator in connection with claims processing or adjudication (including the management of appeals) or plan enrollment." *Id.* at A3670.

The definition of "contributing entity" in the 2013 Proposed Rule reads as follows:

> *Contributing entity* means—
> (1) A health insurance issuer; or
> (2) For the 2014 benefit year, a self-insured group health plan (including a group health plan that is partially self-insured and partially insured, where the health insurance coverage does not constitute major medical coverage), whether or not it uses a third party administrator; and for the 2015 and 2016 benefit years, a self-insured group health plan (including a group health plan that is partially self-insured and partially insured, where the health insurance coverage does not constitute major medical coverage) that uses a third party administrator in connection with claims processing or adjudication (including the management of appeals) or plan enrollment.  A self-insured group health plan that is a contributing entity is responsible for the reinsurance contributions, although it may elect to use a third party administrator or administrative services-only contractor for transfer of the reinsurance contributions.

*Id.* at A3714.  The public comment period on the 2013 Proposed Rule closed on December 26, 2013.  *Id.* at A3652.

On March 11, 2014, HHS published its third and final rule defining "contributing entity." *See* Def.'s Mot. App. 9 (79 Fed. Reg. 13744 (March 11, 2014)) (ECF No. 6-9) (2014 Final Rule). This time, HHS concluded that, although ACA section 18061 "can reasonably be interpreted in more than one way with respect to the applicability of reinsurance contributions to self-insured, self-administered plans[,] . . . the better reading of section 1341 is that a self-insured, self-administered plan should not be a contributing entity. . . ." *Id.* at A4702. HHS explained that excluding self-administered, self-funded group health plans from the definition of "contributing entity" was the better reading because both section 1341(b)(3)(B) of the ACA and section 153.400(a)(1)(ii) of Title 45 of the United States Code of Federal Regulations provide that reinsurance contributions are to reflect a "commercial book of business," and a self-administered plan would not normally be considered part of an entity's commercial book of business. *See id.*

As noted, HHS also advised that, "as a matter of public policy," the new definition of "contributing entity" would only apply prospectively, for 2015 and 2016. 2013 Proposed Rule at A3671. HHS justified its definitional distinguishment for the 2014 plan year by reasoning that "making the proposed exemption effective for the 2014 benefit year at this late stage would be disruptive to plans and issuers that have already set contribution rates and premiums and could upset settled estimates with respect to expected reinsurance payments and contribution obligations." 2014 Final Rule at A4703.

In response to the 2013 Proposed Rule, several public commenters had argued that self-insured plans, which did not use a health insurance issuer as TPAs, should be exempt from the definition of contributing entity. *Id.* at A4703. HHS rejected these arguments and explained its view that there is no statutory support for this exemption because "sections 1341(b)(1)(A) and (b)(3)(A) of the Affordable Care Act only refer[] to issuers and TPAs, and do[] not distinguish

between issuer TPAs and non-issuer TPAs." *Id*.  HHS further reasoned that, in contrast to self-administered plans, plans that are administered by a third-party administrator would normally be considered part of a commercial book of business. *Id*. at A4702.  Based on the statutory language and the commercial nature of TPAs, HHS concluded that it did not have "the authority to differentiate between TPAs that are issuers or issuer affiliates and non-issuer TPAs for purposes of the exemption." *Id*. at A4703.

HHS's final definition of "contributing entity" in its 2014 Final Rule reads as follows:

*Contributing entity* means—
(1) a health insurance issuer; or
(2) For the 2014 benefit year, a self-insured group health plan (including a group health plan that is partially self-insured and partially insured, where the health insurance coverage does not constitute major medical coverage), whether or not it uses a third party administrator; and for the 2015 and 2016 benefit years, a self-insured group health plan (including a group health plan that is partially self-insured and partially insured, where the health insurance coverage does not constitute major medical coverage) that uses a third party administrator in connection with claims processing or adjudication (including the management of internal appeals) or plan enrollment for services other than for pharmacy benefits or excepted benefits within the meaning of section 2791(c) of the PHS Act.  Notwithstanding the foregoing, a self-insured group health plan that uses an unrelated third party to obtain provider network and related claim repricing services, or uses an unrelated third party for up to 5 percent of claims processing or adjudication or plan enrollment, will not be deemed to use a third party administrator, based on either the number of transactions processed by the third party, or the volume of the claims processing and adjudication and plan enrollment services provided by the third party.  A self-insured group health plan that is a contributing entity is responsible for the reinsurance contributions, although it may elect to use a third party administrator or administrative services-only contractor for transfer of the reinsurance contributions.

*Id*. at 4763; 45 C.F.R. § 153.20 (codifying the definition of "contributing entity" as announced in the 2014 Final Rule).

III.  Plaintiffs' Contributions to the TRP

Pursuant to HHS Rules, "[e]ach contributing entity must make reinsurance contributions annually: at the national contribution rate for all reinsurance contribution enrollees, in a manner specified by HHS[.]"  45 C.F.R. § 153.400(a).  According to HHS, the reinsurance contribution required from a "contributing entity" during a benefit year is calculated by multiplying "[t]he number of covered lives of reinsurance contribution enrollees during the applicable benefit year for all plans and coverage described in § 153.400(a)(1) of the contributing entity" by "[t]he contribution rate for the applicable benefit year."  45 C.F.R. § 153.405.  Defendant required Plaintiffs to pay the reinsurance contribution in the following manner: (1) the contributing entity had to submit an annual enrollment count of the number of covered lives of reinsurance contribution enrollees no later than November 15 of the applicable benefit year; (2) after submitting the annual enrollment count, HHS then notified the contributing entity of the amount of the reinsurance contribution allocated to reinsurance payments, administrative expenses, and the United States Treasury for the applicable benefit year; and (3) the contributing entity remitted reinsurance contributions to HHS.  Compl. ¶ 65 (citing 45 C.F.R. § 153.405).[8]  For benefit year 2014, Defendant required EWTF, OETF, and the Stone Masons to pay a contribution of $63 per covered life—an amount that encapsulated both plan participants and their dependents.  Compl. ¶ 70.  For benefit years 2015 and 2016, Defendant required OETF and the Stone Masons to pay a contribution of $44 and $27 per covered life, respectively.  Compl. ¶ 68.  For benefit years 2015 and 2016, EWTF did not make TRP contributions.  45 C.F.R. § 153.20.

---

[8] Plaintiffs' complaint appears to cite to the pre-2016 version of 45 C.F.R. § 153.405.  Section 153.405 was amended in 2016, but that amendment does not appear to have materially altered the TRP contribution process.

EWTF paid $865,357.50 to Defendant on January 9, 2015, reflecting its first payment for benefit year 2014. Compl. ¶ 70. It paid an additional $173,071.50 to Defendant on November 9, 2015, reflecting a total sum of $1,038,429 paid for benefit year 2014. *Id*. OETF remitted TRP contribution payments to Defendant in the amount of $142,569 on January 12, 2015; $107,712 on January 8, 2016; and $72,873 on January 10, 2017. Compl. ¶ 71. Collectively, OETF paid Defendant $323,154 for benefit years 2014, 2015, and 2016. Compl. ¶ 22. The Stone Masons remitted TRP contribution payments to Defendant in the amount of $20,664 on January 14, 2015; $14,476 on January 14, 2016; and $11,637 on January 13, 2017. Compl. ¶ 72. Collectively, the Stone Masons paid Defendant $46,777 for benefit years 2014, 2015, and 2016. Compl. ¶ 24.


IV. <u>Subsequent Litigation</u>

In June 2016, EWTF filed suit in federal district court under 28 U.S.C. § 1346(a)(1), challenging HHS's 2015 assessment of the ACA's section 1341 on self-insured, self-administered plans. *See Electrical Welfare Trust Fund v. United States*, No. 16-2186, 2017 WL 3116693, *2 (D. Md. Jul. 21, 2017). The district court dismissed the suit for lack of jurisdiction and the United States Court of Appeals for the Fourth Circuit affirmed. *Electrical Welfare Trust Fund v. United States*, 907 F.3d 165, 168-70 (4th Cir. 2018).

In 2017, EWTF, Stone Masons, and OETF filed suit in the United States Court of Federal Claims under alleging the TRP constituted "an internal-revenue tax illegally collected under 28 U.S.C. § 1346(a)(1)" and deprived Plaintiffs of "of property without due process of law or without just compensation in violation of the Due Process and/or Takings clauses of the Fifth Amendment of the United States Constitution." *Operating Engineers Trust Fund of Washington, D.C., et al. v. United States*, No. 17-cv-1732, ECF No. 1. On March 6, 2019, the parties in that case filed a

stipulation of dismissal without prejudice pursuant to Rule 41(a)(1)(A)(ii)—two days before Plaintiffs filed their complaint in the present action. *Id.* at ECF No. 29.

On May 7, 2019, Defendant moved to dismiss Plaintiffs' complaint for lack of jurisdiction[9] and for failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), and alternatively moved for summary judgment. *See generally* Def.'s Mot.; Def.'s Reply. On February 27, 2020, this case was reassigned to the undersigned judge, and subsequently this Court held oral argument on the pending motions. *See* Order Reassigning Case (ECF No. 15).

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff also must establish "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678. Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (citations omitted).

Pursuant to Rule 56, summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). A "genuine" dispute is one that "may reasonably be resolved in favor of either party," and a fact is "material" if it might significantly alter the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248,

---

[9] As noted, Defendant withdrew its Rule 12(b)(1) motion at oral argument. Def. Reply at 20 n.8; Oral Argument Transcript (ECF No. 21) at 5:13-19.

250.  In determining the propriety of summary judgment, a court will not make credibility determinations and will draw all inferences in favor of the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

DISCUSSION

Pursuant to the Tucker Act, this Court's primary jurisdictional statute, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution, . . . or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a).  "When the government expropriates property, a plaintiff can obtain relief under either a Takings theory or an illegal-exaction theory . . . but not both."  *Reid v. United States*, 148 Fed. Cl. 503, 528 (2020) (citing *Orient Overseas Container Line (UK) Ltd. v. United States*, 48 Fed. Cl. 284, 289 (2000); *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006)).  The Tucker Act grants this Court jurisdiction over an "illegal exaction" involving money "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967); *see also Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1574 (Fed. Cir. 1996) (finding that an agency's imposition of fees was not authorized because it was based on an interpretation of a regulation that was contrary to the authorizing statute).  Conversely, "Takings claims arise because of a deprivation of property that is authorized by law."  *Orient Overseas Container Line (UK) Ltd.*, 48, Fed. Cl. at 289 (citing *Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000)); *see also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[A] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act[.]").

Therefore, this Court must determine whether HHS's inclusion of Plaintiffs within the definition of "contributing entity" is contrary to statute before it may reach Plaintiffs' Takings claims.

I.  EWTF's Illegal Exaction Claim

The central question underlying Plaintiffs' illegal exaction claims is whether Congress intended for Plaintiffs to make transitional reinsurance contributions under 42 U.S.C. § 18061.  To determine whether HHS's regulation was contrary to statute, the Court is required to apply the familiar framework found in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The first question under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842.  If, after the Court exhausts the "traditional tools of statutory construction," the intent of Congress is clear, "that is the end of the matter." *Id.* at 837, 842-43, 843 n.9.  If, however, the statute "is silent or ambiguous with respect to the specific issue," *id.* at 843, the Court must proceed to the second prong of *Chevron*, under which the Court must "defer to the agency's interpretation if 'the agency's answer is based on a permissible construction of the statute.'" *Cathedral Candle Co. v. U.S. Int'l Trade Commission*, 400 F.3d 1352, 1362 (Fed. Cir. 2005) (quoting *Chevron*, 467 U.S. at 843).

In determining whether it was permissible for HHS to include EWTF's self-insured, self-administered ERISA Fund within the definition of contributing entity, this Court must begin with the text of the statute.  *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, (2004); *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330 (1978); *Strategic Hous. Fin. Corp. of Travis Cty. v. United States*, 608 F.3d 1317, 1323 (Fed. Cir.

2010). "If the statutory language is plain, [the Court] must enforce it according to its terms." *King v. Burwell*, 576 U.S. at 474. "[W]hen deciding whether the language is plain, [the Court] must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (quotations omitted). Moreover, the court "'must give effect, if possible, to every clause and word of a statute.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)); *see also Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("each word Congress uses is there for a reason") (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012)). "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect." *Rosete v. Office of Pers. Mgmt.*, 48 F.3d 514, 517 (Fed. Cir. 1995); *accord Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Defendant argues that the term in section 18061(b)(1)(A), "third party administrators on behalf of group health plans," does not directly address the contribution obligation of self-insured group health plans. Def.'s Mot. at 21-22. Specifically, Defendant argues that "on behalf of" could be reasonably interpreted to mean "a self-insured group health plan is ultimately responsible for the reinsurance contributions, even though it may elect to use a TPA or ASO to transfer reinsurance contributions." *See* Def.'s Mot. at 21-22 (citing A3565, A2027); *see also Ohio v. United States*, 154 F. Supp. 3d 621, 625 (S.D. Ohio 2016) (finding that "Congress intended for all group health plans, including those operated by state or local governments, to pay into the Transitional Reinsurance Program.") *aff'd* 849 F.3d 313, 318-322 (6th Cir. 2017) (holding that the TRP applies to state-provided group health insurance plans). In other words, according to Defendant, the term "on behalf of" could purportedly indicate that a third-party administrator was merely a "conduit"

and the statutory contribution obligations ran to the group health plan regardless if the plan was self-administered or used a third-party administrator.  Def.'s Mot at 22 (citing A3565 ("Although self-insured group health plans are ultimately liable for reinsurance contributions, a third-party administrator or administrative-services only contractor may be utilized for transfer of the reinsurance contributions.")); *see also* Def.'s Reply at 10-20.  Defendant argues that HHS's interpretation of section 18061 requiring all group health plans to contribute to the program, is therefore permissible.  Def.'s Reply at 10-20.  This Court finds that HHS has warped Congress's plain language, likely as a means to its own ends.

The plain language of section 18061(b)(1)(A) requires "health insurance issuers, and third-party administrators on behalf of group health plans . . . to make [reinsurance contributions]."  A presumption exists that each word Congress uses in a statute is there for a reason. *See Advocate Health Care Network*, 137 S. Ct. at 1659 (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012)).  Defendant's interpretation is in complete contravention of that well-established tenet of statutory interpretation and effectively reads "third party administrators" out of the statute.  If Congress meant that all group health plans would pay the TRP, it could have easily omitted its third-party administrator qualifier.  Indeed, when Congress has meant to regulate self-administered group health plans, it has done so specifically.  For instance, 42 U.S.C. § 1395y(b)(7)(A) explicitly identified when statutory duties applied to both an "entity serving as an insurer or third party administrator for a group health plan" and "a group health plan that is self-insured and self-administered. . . ."  "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect." *Rosete*, 48 F.3d at 517; *accord Conn. Nat'l Bank*, 503 U.S. at 253-54 ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." (cleaned up)).

It is also telling that HHS itself ultimately concluded "that the better reading of section 1341 is that a self-funded, self-administered plan should not be a contributing entity." 2014 Final Rule at A4702.  Notwithstanding its express acknowledgment, HHS maintained "as a matter of public policy," that the its revised definition of "contributing entity" would only apply prospectively, for the 2015 and 2016 plan years, because "making the proposed exemption effective for the 2014 benefit year at this late stage would be disruptive to plans and issuers that have already set contribution rates and premiums, and could upset settled estimates with respect to expected reinsurance payments and contribution obligations." *Id.* at A4703.  Although HHS acknowledged that its interpretation was not a natural reading of the statute, HHS would not correct its previous interpretation to apply to the 2014 plan year because it had already relied on that erroneous interpretation and reversing course to adhere to the plain language of the statute would be administratively difficult.  This Court is not aware of an exception that would permit an agency to rewrite the law for plan year 2014 based on such purported administrative difficulties.  HHS did not have authority to ignore the plain language of the statute in the name of public policy or administrative efficiency. *See Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").  This is especially true where, as here, HHS itself caused the "public policy" (or administrative difficulties) concern through its own admittedly erroneous interpretation.

Defendant's reliance on *Ohio v. United States*, a case involving TRP fees, is not persuasive.  In *Ohio*, the State of Ohio challenged TRP fees as applied to include state and local entities. 154 F. Supp. 3d at 627-28.  The district court held HHS did not err in requiring Ohio to pay a TRP fee because states and localities were included in the definition of "group health plans."  In rejecting Ohio's challenge, the court explained that "[p]ut simply, Congress intended for all group health

plans, including those operated by state and local governments, to pay into the Transitional

Reinsurance Program." *Id.* at 625 (emphasis omitted). In a footnote, the district court stated

> Although § 18061(b)(1)(A) states that "third party administrators[,] on behalf of
> group health plans, are required to make payments," HHS has interpreted this
> provision to mean that group health plans themselves are liable for the
> contributions, "although [the plans] may elect to use a third-party administrator . . .
> for transfer of the reinsurance contributions." 45 C.F.R. § 153.20. This
> interpretation makes inherent sense given the simple fee-shifting that would occur
> were the rule otherwise.

*Id.* at 633 n.5.

This Court is not bound by the dicta in a district court decision. *See Camreta v. Greene*,

563 U.S. 692, 709 n.7 (2011). Indeed, the argument that self-administered plans are not required

to pay the TRP fee was not before the district court in that case. In *Ohio v. United States*, the

United States District Court for the Southern District of Ohio addressed, *inter alia*, "whether

Congress intended the Transitional Reinsurance Program to apply to state and local governments

that offer qualifying group health plans . . . ." 154 F. Supp. 3d at 628. But to the extent the *Ohio*

district court held that section 1341 of the ACA applies to all group health plans such a holding

effectively reads "third party administrator on behalf of" out of the statute. As noted, HHS's

purported "policy concerns," including concerns over "fee-shifting," do not trump the plain

meaning of the statutory text. *See Util. Air Regulatory Grp.*, 573 U.S. at 325. Indeed, as HHS

expressly acknowledged in its 2014 Final Rule, it would also make inherent sense for Congress to

exclude group health plans that did not use a third-party administrator because these entities had

little to no connection to the commercial healthcare market. 2014 Final Rule at A4702 ("[T]he

better reading of section 1341 is that a self-funded, self-administered plan should not be a

contributing entity.").

As EWTF clearly alleged that it is a self-funded, self-administered plan that does not use a third-party administrator, Defendant's motion dismiss EWTF's illegal exaction claim must be denied.

## II. OETF's and Stone Masons' Illegal Exaction Claims

OETF and Stone Masons allege that their TRP contribution respective payments for benefit years 2014, 2015, and 2016 constituted an illegal exaction because HHS's definition of "contributing entity" exceeded its statutory authority and was an unreasonable interpretation of 42 U.S.C. § 18061. *See generally* Compl ¶¶ 105-111.

In analyzing OETF's and Stone Masons' illegal exaction claims, the Court must again begin with the plain language of the statute. Plaintiffs argue that section 18061(b)(1)(A) applies only to health insurance issuers and commercial issuers acting as administrators and because OETF and Stone Masons' third-party administrators are not also health insurers. Pls.' Resp. at 27-28.

This argument is unavailing. Nothing in the statute precludes HHS from calculating fees for group health plans administered by an ASO. The statute does not differentiate between third-party administrators, which are also health insurance issuers, and those third-party administrators, which are not. Moreover, section 18061(b)(3)(A) explicitly grants authority to HHS to establish a specific method to calculate the reinsurance contribution fee for group health plans which use a third-party administrator. Section 18061(b)(3)(A) states that "contribution amount[s] for any plan year may be based on the percentage of revenue of each issuer and the total costs of providing benefits to enrollees in *self-insured plans* . . . ." 42 U.S.C. § 18061 (emphasis added). The statute's reference to "self-insured plans" in the context of section 18061(b)(3)(A)'s general

instruction for calculating reinsurance contributions clearly indicates Congress's intention to subject self-insured plans that use a third-party administrator to reinsurance contributions.

Plaintiffs next contend that section 18061's reference to "commercial book of business" and NAIC indicates that Congress intended TRP to apply to health insurance issuers.  Pls.' Resp. at 7, 30-31.  While section 18061 indicates that Congress placed emphasis on health insurance issuers, section 18061's reference to a "commercial book of business" or to NAIC does not prohibit HHS from defining "contributing entity" to include self-insured group health plans.  That Congress mandated more detailed instructions for health insurance issuers does not nullify section 18061(b)(1)(A)'s and 18061(b)(3)(A)'s references to group health plans that use a third-party administrator.

Next, Plaintiffs contend that HHS's interpretation was unreasonable because, under 42 U.S.C. § 18061(b)(1)(B), only commercial health insurers could receive reinsurance payments. Pls.' Resp. at 1, 7-9, 18-19, 37-38.  However, the plain language of section 18061 clearly permitted HHS to collect reinsurance contributions from self-insured group health plans while providing for only health insurance issuers to receive funds from the TRP.  Section 18061(b)(1)(A) requires "health insurers issuers[] and third party administrators on behalf of group health plans" to contribute to the TRP.  In the very next subparagraph, section 18061(b)(1)(B), mandates that only "health insurance issuers . . . that cover high risk individuals in the individual market" are eligible to receive payments out of the TRP fund.  The proximity of these provisions indicates that Congress intended to define contributing entities differently than those entities that were eligible to receive TRP funds. *See Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) ("The interrelationship and close proximity of these provisions of the statute presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act

25

are intended to have the same meaning." (internal quotations and citations omitted)).   It is well-established, as the Supreme Court has observed, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citing *United States v. Wong Kim Bo*, 472 F.2d 710, 722 (5th Cir. 1972)); *see also Heino v. Shinseki*, 683 F.3d 1372, 1379 (Fed. Cir. 2012) (endorsing the *Russello* principle).   As the statute at issue does not prohibit HHS from including Stone Masons and OETF funds within the definition of "contributing entity," this Court cannot find that HHS acted contrary to section 18061's plain language when HHS defined "contributing entity" to include health care groups using ASO third-party administrators.

Nor is Plaintiffs' reliance on legislative history persuasive.   In its opposition to Defendant's motion, Plaintiffs cite (1) the September 2009 Senate Finance Committee Mark of the America's Healthy Future Act of 2009, which Plaintiffs contend contained base text of what would later become ACA section 1341, and (2) June 2014 testimony before the House of Representatives by Mandy Cohen, Acting Deputy Administrator of HHS and Director of the Center for Consumer Information and Insurance Oversight.   Pls.' Resp. at 33.

In September 2009, the Senate Finance Committee released the Chairman's Mark of the America's Healthy Future Act of 2009.   Compl. ¶ 46 (citing *Legislation*, *H.R. 3590: Patient Protection and Affordable Care Act of 2009*, THE UNITED STATES SENATE COMMITTEE ON FINANCE,  http://www.finance.senate.gov/legislation/details/hr-3590; Chairman's Mark, America's Healthy Future Act of 2009, THE UNITED STATES SENATE COMMITTEE ON FINANCE                                        at                                        8-9,

https://www.finance.senate.gov/imo/media/doc/091609%20Americas_Healthy_Future_Act.pdf

(last visited Mar. 5, 2019).  The Chairman's Mark stated:

> [a]s a condition of issuing commercial, major medical health insurance policies or administering benefit plans for major medical coverage in years 2013, 2014, and 2015, all health insurance issuers would be required to contribute to a reinsurance program for individual policies that is [sic] administered by a non-profit reinsurance entity that would function as described below.

Pls.' Resp.  at 31 (emphasis omitted) (citing Compl. ¶ 46).  The Chairman's Mark also stated that

the "requirement would be enforced at the state level" and the "National Association of Insurance

Commissioners (NAIC) would be directed to develop a model for states to adopt."  *Id* (citing

Compl. ¶¶ 36 n.10, 47.  The Chairman's Mark further provided "[t]he contribution amount must

proportionally reflect each entity's fully insured commercial book of business for all major medical

products and third-party administrators (TPA) fees (e.g., based on percentage of revenue or flat,

per enrollee amount)."  *Id.* (citing Compl. ¶ 47).  Plaintiffs note that there is no discussion in the

Chairman's Mark of non-commercial employee benefits.  Pls.' Resp. at 32.

      In June 2014, Mandy Cohen, Acting Deputy Administrator of HHS, testified before the

House Committee on Oversight and Government Reform that the intent of the TRP was "to help

provide stability in the health insurance market as the Affordable Care Act extends new benefits

to consumers" and "encouraging issuers to participate in the Marketplace and compete on price

and quality." Compl. ¶ 44. [10]

---

[10] *Testimony by Mandy Cohen M.D.*, *Acting Deputy Administrator and Director Center for Consumer Information and Insurance Oversight Centers for Medicare & Medicaid Services U.S. Department of Health and Human Services (HHS) on The Affordable Care Act's Premium Stabilization Programs: Reinsurance, Risk Corridors, and Risk Adjustment* before Committee on Oversight & Government Reform United States House of Representatives (June 18, 2014), https://docs.house.gov/meetings/GO/GO28/20140618/102420/HHRG-113-GO28-Transcript-20140618.pdf.

"[L]egislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018). The Constitution establishes specific procedures for the enactment of statutes. *See* U.S. Const. Art. I, § 7, cls. 2, 3. Statements made by legislators whether made on the floor or in a committee report are not subject to bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 946-52 (1983). The legislature acts as a collective and the enactment of a law often represents a compromise between individual legislators and between individual legislators and the president. The Court's reliance on statements made by individual legislators and committees "would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some evidence about the law, while the real source of legal rules is the mental processes of legislators." *Matter of Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) (Easterbrook, J.). This Court accordingly looks to the plain language of the statute and not to legislative history when conducting its interpretation.

Even if this Court were to consider the legislative history cited by Plaintiffs, there is nothing in the legislative history to suggest that Congress clearly intended for section 18061 to only apply to those entities. *Azar v. Allina Health Svcs.*, 139 S. Ct. 1804, 1814 (2019) ("And even those of us who believe that clear legislative history can 'illuminate ambiguous text" won't allow 'ambiguous legislative history to muddy clear statutory language.'" (internal citation omitted)).

The Court's analysis must, therefore, proceed to *Chevron* step two, in which the Court should defer to HHS's interpretation of section 18061(b) as long as it "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute. . . ." *Chevron*, 467 U.S. at 845 (internal quotations and citation omitted).

Plaintiffs argue that HHS's interpretation of section 18061(b) is unreasonable because according to Plaintiffs, Stone Masons and OETF were not part of the problem Congress sought to

fix through the TRP.  Specifically, Plaintiffs argue that the TRP was designed "to help stabilize premiums for coverage in the individual market during the first 3 years of operation of an Exchange . . . when the risk of adverse selection related to new rating rules and market changes [was] greatest."  Pls.' Resp. at 30 (quoting 42 U.S.C. § 18061(c)(1)(A)); *see also* Compl. ¶¶ 6, 38. Plaintiffs argue that "ERISA Funds do not collect premiums, do not operate in the individual market, and are not sold on the ACA's exchanges, they neither affect nor are affected by the problem the TRP was designed to address." Pls.' Resp. at 30 (citing Compl. ¶¶ 28, 33). Additionally, because Plaintiffs did not exclude participants with pre-existing conditions, Plaintiffs did not undertake additional risk when Congress abolished denials for pre-existing conditions under the ACA.  *See* Compl. ¶¶ 38, 50; Pls.' Resp. at 4-6.

Defendant argues that in view of TRP's goal of stabilizing premiums, HHS reasonably required both health insurance issuers and self-insured group health plans to contribute to the reinsurance program, because such an interpretation distributed the risk of enrolling new high-risk patients over the entire health insurance market.  Def.'s Mot. at 27, 30.

This Court agrees with Defendant that HHS reasonably interpreted section 18061(b) considering the section's text, structure, and purpose.  Plaintiffs understandably take issue with the fact that HHS's implementing regulations require Plaintiffs' group health plans to pay into a program from which they were not eligible to receive payment and which was purportedly enacted to address an issue non-attributable to Plaintiffs' group health plans.  In enacting section 18061, however, Congress did not limit or define "contributing entities" to those entities eligible to receive payment out of the fund.  Nor did Congress limit HHS's authority to define "contributing entity" to those entities that excluded individuals with pre-existing conditions.  As reflected in much of the ACA, many pay into the program, but that doesn't always equate to those entities or persons

eligible to receive benefits.  *See e.g.*, 42 U.S.C. § 18062(b) (instructing HHS to establish the risk corridors program under which health plans with lower allowable cost pay into the program and health plans with higher allowable cost receive payment under the program).

Congress charged HHS, not this Court, with authority to implement the TRP.  *See* 42 U.S.C. §§ 18041(a)(1)(C) (delegating authority to HHS to issue regulations for, *inter alia*, TRP), 18061(b)(1) (requiring the Secretary of HHS to establish standards under section 18041(a)). Whether or not this Court agrees with *Chevron*, it is bound to follow it as a lower court, and HHS's interpretation is entitled to deference "[i]f this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute . . . ."  *Chevron*, 467 U.S. at 845 (internal quotations and citation omitted).

As stated in the ACA, the primary purpose of the TRP was to help stabilize premiums for coverage in the individual market during the first three years of operation of the ACA when the risk of adverse selection related to new rating rules and market changes was greatest.  *See* 42 U.S.C. § 18061(c)(1)(A) (stating the purpose for "applicable reinsurance entity").  HHS, through three separate rounds of rulemaking, carefully considered the statutory language and comments from interested parties to tailor a rule that would, in its view, effectuate this purpose.  HHS received conflicting comments suggesting that exempting those plans from the contribution would decrease the premium stabilization effects of the program. *See, e.g.*, Def.'s Mot. App. 8 at A3738, Comment from BlueCross BlueShield Association to CMS (Dec. 23, 2013) (ECF No. 6-8) ("The exclusion of self-funded plans that do not use [third-party administrators] from the reinsurance contribution pool will shift costs to remaining contributors. . . .  [S]hould the exemption for self-insured, self-administered plans be finalized into law, the industry would need to pass through the shortfall amount to all commercial lines of business.  This would discourage self-insured groups that use a

[third-party administrator], as well as fully-insured groups."); Def.'s Mot. App. 8 at A4015-27, Comment from National Coordinating Committee for Multiemployer Plans (NCCMP) to CMS (Dec. 26, 2013) (arguing that requiring self-administered group health to make temporary reinsurance contributions while barring their plans from realizing any benefit of risk pooling is unfair and contrary to the plain language of section 18061). Through the iterative rulemaking process, HHS concluded that TRP's intended stabilizing effects would be best achieved by including within the definition of "contributing entity" the widest statutorily permissible range of health insurance issuers and group health plans. *See* 2013 Final Rule at A3628.

Even if this Court disagrees with HHS's rational, it is not this Court's job to make policy. *See Chevron*, 467 U.S. at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."); *Anderson v. Wilson*, 289 U.S. 20, 27 (1933) ("We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it.").

Accordingly, Defendant's motion to dismiss is granted with respect to OETF's and Stone Masons' illegal exaction claims.

III. <u>Plaintiffs' Takings Claims</u>

Even if HHS's definition were permissible under the ACA, this Court must determine whether EWTF, OETF, and Stone Masons may still recover under their Takings claims.[11]

---

[11] The parties' filings do not distinguish between EWTF, OETF, and Stone Masons for their Takings arguments; and, for purposes of this Memorandum and Order's Takings analysis, the Court does not distinguish between the two. *See generally* Def.'s Mot. at 11-14; Pls. Resp. 12-21. As noted, if EWTF ultimately succeeds on its illegal exaction claim, it cannot also proceed under

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

The Federal Circuit has developed a two-step approach to Takings claims. *See Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). First, a plaintiff must identify the property interest that was allegedly taken. *Adams*, 391 F.3d at 1218. Second, "[o]nce a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." *Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002)); *see also Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("If a plaintiff possesses a compensable property right, . . . a court determines whether the governmental action at issue constituted a taking of that 'stick.'" (citing *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995))). Courts cannot reach this second step without initially identifying a cognizable property interest. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012); *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

Plaintiffs argue that they have a cognizable property interest because their group healthcare plans consist of "a specific fund" that is "held in trust for the benefit of plan participants and their

---

its Takings Claim. *See Reid*, 148 Fed. Cl. at 528. However, Plaintiffs (including EWTF) have not cross-moved for summary judgment on any of its claims. Accordingly, the Court cannot affirmatively rule in favor of EWTF on its illegal exaction claim at this time. Consequently, the Court includes EWTF in its Takings analysis in this Memorandum and Order.

families pursuant to federal law." Pls.' Resp. at 12-16 (citing 29 U.S.C. § 1103(c) (ERISA's exclusive benefits provision)); Compl. ¶¶ 92-93. Plaintiff argues that the TRP constituted either a per se or regulatory Taking because it deprived the plan participants of those funds without receiving any benefit from the TRP. Compl. ¶¶ 94-95.

Defendants argue Plaintiffs fail to state a valid Takings claim because the TRP creates an ordinary obligation to pay money. Def.'s Mot. at 11-14; Def.'s Reply at 3. Defendant also argues that, even assuming that Plaintiffs have a cognizable property interest in their ERISA fund assets, Plaintiffs' Takings claims fail, under either as a per se or regulatory Taking, because Plaintiffs do not have a reasonable expectation that ERISA funds would be shielded from legislative enactments requiring payment. Def.'s Mot. at 14; Def.'s Reply at 5 (citing *Boyle v. Anderson*, 68 F.3d 1093, 1102 (8th Cir. 1995) (holding ERISA's exclusive benefit provisions were "intended to prohibit . . . wrongful diversions of trust assets" resulting from "self-dealing, imprudent investing, and misappropriation of funds.").

If Plaintiffs do not have a cognizable property interest, their Takings claims must fail. *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation.") (citing, *inter alia*, *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973)). The Constitution itself neither creates nor defines the property interests that, if taken by the Government, are compensable under the Fifth Amendment. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Rather, "existing rules or understandings that stem from an independent source, such as state," federal, or common law, create and define the dimensions of property interests for purposes of establishing a

cognizable right and hence a potential taking.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (quoting *Roth*, 408 U.S. at 577).  As the Federal Circuit has noted:

> Property interests are about as diverse as the human mind can conceive.  Property interests may be real and personal, tangible and intangible, possessory and nonpossessory.  They can be defined in terms of sequential rights to possession (present interests—life estates and various types of fees—and future interests), and in terms of shared interests (such as those of a mortgagee, lessee, bailee, adverse possessor), and there are interests in special kinds of things (such as water, and commercial contracts).  And property interests play across the entire range of legal ideas.

*Adams v. United States*, 391 F.3d at 1219 (quoting *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1572 n.32 (Fed. Cir. 1994)).

The issue here is whether Plaintiffs' ERISA funds constitute a "specific fund of money" protected by an "identified property interest."  Ordinarily, the "mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc); *Kitt v. United States*, 277 F.3d 1330, 1336 (Fed. Cir. 2002), *on reh'g in part,* 288 F.3d 1355 (Fed. Cir. 2002) (holding that a tax imposed on early withdrawals from individual retirement accounts was not a taking); *see also United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989) (holding that a federal statute that required the payment of a portion of an arbitral award from the Iran–United States Claim Tribunal to the United States government did not violate the Takings Clause because, in part, "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property.  Unlike real or personal property, money is fungible."); *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1383 (Fed. Cir. 2002) (holding that a statute requiring the payment of Harbor Maintenance Tax on exported merchandise violated the Export Clause, but was not a taking).  However, when a specific fund of money is protected by an identifiable property interest, a Taking may occur.  *See Commonwealth Edison Co.*, 271 F.3d at 1339-40.

For instance, in *Webb's Fabulous Pharmacies v. Beckwith*, Eckerd's of College Park, Inc. entered into an agreement to purchase substantially all the assets of Webb's Fabulous Pharmacies. 449 U.S. 155, 156 (1980). The debts of Webb's appeared to be greater than the purchase price, so, Eckerd's filed a complaint of interpleader in state court to protect itself from Webb's creditors, interpleading as defendants both Webb's and its creditors and tendering the purchase price to the court. *Id*. at 156-57. The state court deducted a statutorily prescribed fee for maintenance of the fund in the amount of $9,228.74 and an additional amount from the principal of the fund of $40,200 pursuant to court order. *Id*. at 157-58. The remaining principal was paid to a court-appointed receiver to act on behalf of Webb's. *Id*. at 158. However, the clerk of court retained all the interest earned on the principal, approximately $100,000. *Id*. at 157-158. The receiver challenged the clerk's retention of the interest, arguing that the company's creditors were entitled to the interest. *Id*.

The Supreme Court held that the state court's appropriation of the interest earned on the interpleader fund, in excess of a fee for services, resulted in a taking under the Fifth Amendment. *Id*. at 160-61, 164-65. The Supreme Court explained that the deposited fund of the purchase price for the assets of Webb's "plainly was private property," which was "held only for the ultimate benefit of the [receivers], not for the benefit of the court and not for the benefit of the county." *Id*. at 160-61. The Supreme Court also noted that under common law the "general rule [is] . . . that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Id*. at 162-63 (internal citation omitted). The Supreme Court further held that the retention in interest "[was] not reasonably related to the costs of using the courts" but rather "a forced contribution to general government revenues" which amounted to a Taking. *Id*. at 163.

In *Phillips v. Washington Legal Found.*, the Supreme Court examined the constitutionality of a Texas law mandating that interest earned on client funds deposited by attorneys into Interest on Lawyer Trust Accounts (IOLTA) be paid to foundations financing legal services for low-income populations. 524 U.S. at 159-60. Texas had required that lawyers holding nominal amounts of client funds, which would otherwise be unable to earn interest, place such funds in a separate, interest-bearing bank account. *Id.* at 156. Again, applying the "interest follows principal" rule, *id.* at 168, the Supreme Court held that interest generated by client funds in IOLTA accounts remained the private property of those clients. *Id.* at 172. The Supreme Court also noted that the interest income transferred to Texas could not reasonably be viewed "as payment for services rendered by the State." *Id.* at 171 (internal quotation and citation omitted). Thus, the Supreme Court held that the use of the IOLTA's interest income by Texas amounted to a taking.

Plaintiffs argue that the present action is analogous to *Webb's* and *Phillips*. That may be true, but it is difficult for the Court to discern that on the record before it. Important gaps in the record prevent the Court from conclusively determining whether Plaintiffs' ERISA funds are similar to the funds at issue in *Webb's* and *Phillips*. Both *Webb's* and *Phillips* addressed funds covered by an identifiable property interest, *i.e.,* the principal owner's common law right to interest income. *Webb's*, 449 U.S. at 155-56; *Phillips*, 524 U.S. at 160, 165. In both *Webb's* and *Phillips*, the principal funds were held by the government but belonged to the specific depositors. *Webb's*, 449 U.S. at 162-63; *Phillips*, 524 U.S. at 172. Under applicable common law, as the owner of the principal funds, the *Webb's* and *Phillips* plaintiffs were entitled to any interest earned on those funds. *Webb's*, 449 U.S. at 163-64; *Phillips*, 524 U.S. at 172.

Here, unlike in *Webb's* and *Phillips*, the record is unclear as to whether EWTF, OETF, and Stone Masons have a specific property right that the TRP operates to exact from the Funds. As

the record currently stands, Plaintiffs have not identified a cognizable property interest that specific individuals possess in the fund.  Instead, Plaintiffs rely on section 1103(c) of ERISA's "exclusive benefits provision" as support for the proposition that the group health plans constitute a "specific fund of money." *See e.g.*, Compl. ¶¶ 29, 93; Pls.' Resp. at 4, 15-17, 20.  This reliance on ERISA's "exclusive benefits provision," alone, does not suffice to show a cognizable property interest.

The exclusive benefits provision requires that ERISA plan fiduciaries act solely in the interest of participants and beneficiaries and provide benefits exclusively to them or defray reasonable plan administrative costs.  29 U.S.C. § 1104(a)(1)(A); *see also* 60A Am. Jur. 2d Pensions § 371.  ERISA's exclusive benefits provision does not create any property interest as recognized by common law, but instead creates a statutory duty of care on the part of the trustees to hold "all assets of an employee benefit plan . . . in trust" for "the exclusive purposes of providing benefits to participants in the plan and their beneficiaries. . . ."  29 U.S.C. § 1103(a), (c)(1).  ERISA's "exclusive benefits provision" was "intended to prohibit . . . wrongful diversions of trust assets" resulting from "self-dealing, imprudent investing, and misappropriation of plan funds." *Boyle*, 68 F.3d at 1102 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987)).  The Government's imposition of this statutory duty on fund trustees does not alone create a cognizable property interest in ERISA funds.  *See E. Enterprises v. Apfel*, 524 U.S. 498, 544 (1998) (Kennedy, J., concurring in part) ("[T]he Government's imposition of an obligation between private parties, or destruction of an existing obligation, must relate to a specific property interest to implicate the Takings Clause.").[12]  Nor was ERISA's exclusive benefits provision designed to protect funds

---

[12] *Eastern Enterprises v. Apfel* involved a challenge to the retroactive liability provisions of the Coal Industry Retiree Health Benefit Act of 1992, codified at 26 U.S.C. §§ 9701–9722 (the "Coal Act") which required a former mining company to pay a large sum of money for the health benefits of retired employees.  524 U.S. at 504.  Writing for the plurality, Justice O'Connor, joined by three other justices (Chief Justice Rehnquist, Justice Scalia, and Justice Thomas), concluded that the retroactive impact of the Coal Act as applied to Eastern Enterprises resulted in an unconstitutional

from costs arising from generally applicable federal healthcare regulations, like TRP, which appear to simply increase the cost of administration or augment the duty of the fund's trustees. *See United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp.*, 995 F.2d 1179, 1196 (3d Cir. 1993) ("[W]e are unwilling to infer from ERISA's prohibition against applying fund assets for the benefit of others a Congressional intent to foreclose health care cost regulation of the kind here challenged."); *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 645-46 (1993) (noting that ERISA plans have long been the object of legislative concern and that "those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (internal quotations and citation omitted)). Indeed, section 1103(c)(1) explicitly states that trust assets may be used to "defray[] reasonable expenses of administering the plan." The record demonstrates that TRP fees "constitute a permissible expense of the plan for purposes of Title I of [ERISA.]" 2013 Final Rule at A3627 n.41 ("The Department of Labor has reviewed this rule and

---

taking of property because it placed a "severe, disproportionate, and extremely retroactive burden on Eastern." *Id.* at 538. As explained by the Federal Circuit in *Commonwealth Edison Co.*, the plurality found the law was unconstitutional, but five Justices of the Court determined that the law did not effect a Taking, because the law did not appropriate a specific property interest but rather merely imposed an obligation to pay money. 271 F.3d at 1339 (citing *Eastern Enterprises*, 524 U.S. at 540). In his concurrence, Justice Kennedy acknowledged that the statute "impose[d] a staggering financial burden" (which influenced his conclusion that it violated due process). *Eastern Enterprises*, 524 U.S. at 540 (Kennedy, J., concurring). Nevertheless, Justice Kennedy explained, the law did not effect a Taking because it did not "operate upon or alter" a "specific and identified propert[y] or property right," such as an estate in land (e.g., a lien on a particular piece of property), a valuable interest in an intangible (e.g., intellectual property), or even a bank account or accrued interest. *Id.* at 540–541. Instead, "[t]he law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so." *Id.* at 540. Justice Breyer, writing for three other Justices, (Justice Stevens, Justice Souter, and Justice Ginsburg) agreed that the Takings Clause was not implicated. *Id.* at 554–555 (dissenting opinion). He stated that the Takings Clause applies only when the government appropriates a "specific interest in physical or intellectual property" or "a specific, separately identifiable fund of money." By contrast, the Clause has no bearing when the government imposes "an ordinary liability to pay money. . . ." *Id.* at 554-55 (citations omitted).

advised that paying required reinsurance contributions would constitute a permissible expense of the plan for purposes of Title I of the Employee Retirement Income Security Act (ERISA) because the payment is required by the plan under the Affordable Care Act as interpreted in this rule." (citing Advisory Opinion 2001–01A to Mr. Carl Stoney, Jr., available at www.dol.gov/ebsa discussing settlor versus plan expenses)).   Therefore, by the ERISA's exclusive benefits provision's own terms, TRP contribution fees would not deprive Plaintiffs of a property interest in their ERISA funds.

However, Plaintiffs and the beneficiaries of their plans may have some property right in the employee contributions paid into the ERISA funds or may have some contractual right to these funds.   *See Nat'l Educ. Ass'n-Rhode Island ex rel. Scigulinsky v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 172 F.3d 22, 30 (1st Cir. 1999) (stating that the Takings Clause arguably protects *property* interests in funds contributed to an ERISA pension plan); *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 230-31 (1986) (O'Connor, J., concurring) (finding that ERISA's broad definition of defined benefit plan "may in some circumstances raise constitutional doubts under the Taking Clause or Due Process Clause.").   In this respect, Plaintiffs' ERISA plans may be distinguishable from *Adams*, 391 F.3d at 1225, upon which Defendant relies for the proposition that "statutory obligation to be paid money" is not a cognizable "property interest grounded in property law."   Def.'s Mot. at 12-13 (quoting *Adams*, 391 F.3d at 1212, 1224-25).   In *Adams*, federal employees received overtime compensation at a rate less than one-and-one-half times their regular rate of pay.   391 F.3d at 1214.   The *Adams* plaintiffs alleged, *inter alia*, that they had a cognizable property interest "in payment of underpaid overtime compensation according to FLSA rates . . . ."   *Id.* at 1219.   In rejecting these arguments, the Federal Circuit held that where plaintiff is owed money under a statute and the government does not pay the money, the government's non-

payment of the statutory entitlement is not a taking under the Fifth Amendment. *See id.* at 1225. The Federal Circuit distinguished plaintiff's alleged statutory right to unpaid overtime wages from an "express right[s] under [this] contract" or an "actual sum of money." *Id.* at 1221-22. In doing so the Federal Circuit held that a contractual rights and paid sums may be cognizable property interests. *Id.* at 1220.

Unfortunately, neither party has submitted to this Court information concerning how Plaintiffs' plans are funded or the nature of the agreements governing the use of the funds. There is simply no pertinent information on the record before this Court. Accordingly, at this time this Court cannot discern whether or not Plaintiffs or their beneficiaries have a particular property interest in the funds that were used to pay TRP contributions. Further, other courts that have decided Takings claims involving ERISA or similar benefit schemes have found it prudent to address the *Penn Central* three factor test before categorically rejecting a plaintiff's Takings claim. *See Concrete Pipe & Prod. of California, Inc.*, 508 U.S. at 604-05 (analyzing whether "withdrawal liability" under ERISA, 29 U.S.C. §§ 1301–1461 violated the Taking Clause under the *Penn Central* three factor test); *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 225 (1986) (same); s*ee also Maritrans, Inc. v. United States*, 40 Fed. Cl. 790, 797 (1998) (rejecting the government's theory that the regulated nature of the industry precludes a cognizable Fifth Amendment property interest in light of the Supreme Court's decisions in *Connolly* and *Concrete Pipe*).

At this point, there is insufficient information before this Court to grant Defendant's motion. To sufficiently assess Plaintiffs' Takings claim (either on a subsequently-filed motion to dismiss or a motion for summary judgment) the parties must provide the Court with further information concerning: (1) the nature of plaintiffs' property interest in their respective group health care plans, and (2) the effect, if any, the TRP had on those alleged property interests. For

this reason, this Court denies without prejudice Defendant's motion to dismiss Plaintiffs' Taking claims.[13]

<u>CONCLUSION</u>

For the reasons stated, Defendant's motion is **GRANTED in part** and **DENIED in part**. Consistent with this Memorandum and Order, Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 6) is:

1. **DENIED** with respect to EWTF's illegal exaction claim;

2. **GRANTED** with respect to OETF's and Stone Masons' illegal exaction claim; and

3. **DENIED** with respect to Plaintiffs' Fifth Amendment Takings claims.

Within fourteen (14) days of this Memorandum and Order, the parties shall file a Joint Status Report, including a joint proposal for further proceedings.


IT IS SO ORDERED.


 s/ Eleni M. Roumel
ELENI M. ROUMEL
Judge


Dated: July 30, 2021
Washington, D.C.

---

[13] To the extent the parties contend that this Court should consider Defendant's motion as one for summary judgment, the motion is similarly denied without prejudice as there are genuine issues of material fact in dispute concerning the nature of the plaintiffs' property interest and the effect the TRP had on those alleged property interests.